## BARCLAY v. SHARROCK.

### No. 2300.

Court of Civil Appeals of Texas. Eastland.

Oct. 23, 1942.

Rehearing Denied Nov. 13, 1942.

Simon & Simon, of Fort Worth, for appellant.

Blanton & Blanton, of Albany, for appellee.

LESLIE, Chief Justice.

W. R. Sharrock instituted this suit against A. O. Barclay for specific performance of the execution and delivery of an oil and gas lease, and in the alternative for damages for failure to do so. Barclay denied liability, and in a trial before the Court without a jury, plaintiff was awarded $300 damages for breach of the alleged contract. At request of appellant, the trial court filed findings of fact and conclusions of law.

The appellent's main contentions are (1) that the alleged contract was unenforceable under the Statute of Frauds (Article 3995) That the undisputed evidence in this case shows that none of the parties sought to be held executed any contract or memorandum in writing to make the lease and neither did they authorize the appellant, A. O. Barclay, to make such contract; and (2) that the evidence failed to disclose any market value for the lease, and that the judgment was erroneous in awarding $300 damages.

In the light of the first group of contentions, it appears that about December 29, 1940, Sharrock and Barclay entered into negotiations involving the purchase by Sharrock of a 20-acre oil and gas lease, owned by Barclay, his brother and sister. The land was situated in close proximity to

a drilling wildcat well. At the time of the alleged contract Sharrock agreed, among other things, to pay Barclay $200 in cash, or $10 per acre, and $200 in oil if such was struck in a well he was contracting to drill under certain conditions. After oral negotiations and the delivery of abstract and instruments relating to title, plaintiff, Sharrock on December 30, 1940, sent by mail to defendant Barclay at Fort Worth, a typewritten letter signed by plaintiff reading in part as follows: "Enclosed you will find the mineral lease which I have had drawn up in accordance with 'our agreement". In this letter plaintiff instructed the defendant to send the lease, when executed, to plaintiff's bank to be delivered upon the payment of the $200 and he further stated in such letter: "Please make it clear to the bank that I am only to pay $200.00 upon the delivery of the lease."

Upon receipt of the plaintiff's letter and the enclosed lease, Barclay redrafted it, leaving out of it (1) the option granting to Sharrock the right to lease the balance of the tract of land owned by lessors, and (2) reciting a term of two years; but otherwise the lease, as redrawn by Barclay, embraced the conditions that were in the lease plaintiff had sent him.

In redrafting the lease and with reference to the option to lease the balance of the land, Barclay in his letter of December 31, 1940, replying to Sharrock's letter of December 30, 1940, stated: "The refusal of the balance of the land for lease still goes with me, but it has no place in the lease, so I have omitted that". Barclay further stated in that letter: "I hope that this lease is satisfactory to you, and that you will return the same to me so that we may sign."

On receipt of Barclay's letter of December 31st, containing the redrafted lease, plaintiff Sharrock promptly approved the lease, placed $200 on deposit in the bank to pay for same, and in a letter to Barclay dated January 1, 1941, he returned said approved lease (as redrafted) to Barclay, stating in such letter: "Your letter and lease received today and the revised lease is OK, so am mailing it to you by return mail." Defendant Barclay was also instructed to send the lease when executed to the bank for delivery.

After such negotiations and the exchange of the above letters and other instruments, Barclay, his brother and sister, executed the lease which Sharrock okayed in his letter of January 1st.

Under the circumstances developing the plaintiff Sharrock was naturally eager to close the deal, because he was expecting a producer to be drilled in soon on adjoining property. It is alleged, and the evidence shows, that such prospective producer affected favorably the market value of the lease involved. Appellant Barclay's testimony shows as much and also discloses that the contemplated lease was in or near a locality of early and possibly favorable development. While on the witness stand he testified to the communications and instruments involved in the transaction, admitting that he redrafted the lease, that he and his brother and sister executed the same, and that it was tendered for delivery in the cross action. This effort at delivery was after the wildcat failed to produce.

Concerning a conversation about the lease with Mr. Joe Overton, agent of Sharrock, Barclay testified:

"Q. When you wouldn't return this lease to Mr. Sharrock, after he had approved it and sent it back to you, he talked to you over the phone, didn't he? A. On Sunday morning; the same day I had the conversation with Mr. Overton.

"Q. He talked with you? A. Yes, sir.

\* \* \* \* \*

"Q. One week later? A. Yes, sir.

"Q. When you were talking to Joe Overton, over the phone, and Joe Overton told you that they had conferred and advised with his attorneys, you told him that if they had advised with attorneys that you were not going to let them have the lease for any price, didn't you? A. You want his conversation?

"Q. Please answer the question; did you tell him that? A. Yes, sir.

"Q. You told him if he had gotten advice from attorneys you would not let him have the lease for any \* \* \*. .A. Not advice—I said if they had to go consult an attorney to hold me to something that I did not mean, why I would just withdraw the lease and lease it to anybody I wanted.

"Q. When you told him if he had to consult a lawyer you would not lease it to him at any price, you meant it? A. Yes, sir.

"Q. And you told him you was not going to let him have the lease, didn't you? Is that so? A. Yes, sir.

"Q. This is the very lease that he approved? A. Yes, sir.

(The lease later tendered by Barclay)

"Q. And you never got into the notion of making this lease, until he sued you, did you? A. No. We didn't intend to make that lease.

"Q. And if these dry holes hadn't come in and changed the conditions, where nobody would offer you anything, you wouldn't have ever made this lease in March would you? Tell the Court, isn't that so? A. I don't have any idea I would.

"Q. Yes, And you thought that would stop this suit didn't you? A. Yes, sir.

"Q. And you thought that by sending him a worthless lease, after the dry holes had come in here that you could make it all right with Roy Sharrock for your refusing to give him a lease because he had consulted a lawyer? A. Just as much oil in the ground now as there was the day that the lease was made.

\* \* \* \* \*

There is testimony suggesting still another motive for refusing to make and deliver the lease in time. In the letter of December 31, 1941, returning the redrafted lease to Sharrock, Barclay made the observation: "I had a call from Albany Sunday night insinuating that there was more money to be had. I heard from the same party again yesterday."

Touching upon such considerations, he testified:

"Q. There was a number of parties negotiating with you? A. Yes, sir.

"Q. And there were various offers that had been made to you? A. Yes, sir.

"Q. And Mr. Woods had made two different offers to you? A. Yes, sir.

"Q. What offers did he make? A. The last offer that I know anything about was $500.00 in cash; $500.00 in oil and a well; one well.

"Q. Then he offered 2½ times as much as Roy had offered you, did he? A. Yes, sir.

\* \* \* \* \*

There is other testimony, that while activities existed about the wildcat well, the appellant Barclay was offered $50 an acre for the lease. Obviously time was of the essence of the lease contract.

From the above and other testimony it is apparent that the lease was not exe-cuted and delivered at the time contemplated for at least two reasons: In the first place, Barclay seems to have been indignant at Sharrock for venturing to consult an attorney concerning his legal rights in the premises, and in the second place, he was quite certain that the speculative value of the lease had enhanced. Be that as it may, it is quite evident from the appellant's testimony that he refused to make the lease or have the same executed and delivered as per the understanding with Sharrock.

■ It is unnecessary to discuss the different elements, instruments and communications leading up to and entering into the consummation of the deal. After a careful consideration of the same we are of the opinion that the letters and communications specifically referred to, especially when taken in connection with other instruments furnished Sharrock by Barclay, fully establish and constitute memorandum in writing, evidencing an enforceable contract between said Sharrock and A. O. Barclay. This action is not inhibited by the statute of frauds.

In 20 Texas Jur. page 306, § 98, it is said "Inasmuch as the memorandum is required only as evidence of the contract, the courts consider that, in order to satisfy the requirements of the law, it need not be made at the time when the parties enter into the agreement, but that it may be made at a later date. 'The memorandum may be made subsequent to the agreement.' Thus the condemnation of the statute of frauds is removed, for example, by the execution of an oil lease after the making of an oral leasing agreement or by the execution and tender of a deed after the making of an oral agreement for the sale of land."

For other pertinent authorities reflecting the nature of instruments held sufficient to evidence enforceable contracts under the statute of frauds, see the following: Duble v. Batts & Dean, 38 Tex. 312; G. C. & S. F. Railway Co. v. Settegast, 79 Tex. 256, 15 S.W. 228; Longinotti v. McShane, Tex.Civ.App., 184 S.W. 598; McKy et al. v. Walker, Tex.Civ.App., 293 S.W. 921. Black v. Hanz, Tex.Civ.App., 146 S.W. 309; 20 Texas Jur. page 306, § 97, etc.

■ The evidence supports the judgment in the amount of damages given. The learned trial court has made full and

specific findings on all issues raised, and we approve the same.

Barclay's effort to deliver the lease by tendering same in his cross action filed as late as March 17, 1941, should avail him nothing as a basis for recovery of the contemplated price ($200 etc.) which Sharrock in the outset agreed to pay for the twenty acre lease. Long prior to that date (March 17th) the wild cat well had been abandoned as a dry hole, and for reasons satisfactory to him, the appellant had theretofore withheld any earlier delivery of the instrument.

All assignments of error in the respective briefs have been considered and are hereby overruled. For the reasons assigned, the judgment of the trial court is affirmed.